UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JENNY KELLEY,           )
                              )
      Plaintiff,       )
                              )       No. 3:11-cv-34
v.                       )       *Mattice / Lee*
                              )
THE HARTFORD,         )
                              )
      Defendant.     )

## REPORT AND RECOMMENDATION

Plaintiff Jenny Kelley ("Plaintiff") brought this ERISA[1] action against Defendant The Hartford ("Defendant"), seeking reinstatement of long term disability ("LTD") benefits under a Group Long Term Disability Insurance Plan ("Plan") sponsored by her employer, Blount Memorial Hospital. The parties each moved for judgment on the pleadings and the motions were referred for a report and recommendation [Doc. 11]. For the reasons below, I **RECOMMEND** that Plaintiff's motion for judgment on the pleadings [Doc. 19] be **DENIED**, that Defendant's motion for judgment on the pleadings [Doc. 22] be **GRANTED**, and that this action be **DISMISSED WITH PREJUDICE**.

I.     **BACKGROUND**

     A.     **Overview of Plaintiff's Relevant Medical Records**

After a flood in Plaintiff's basement office in April of 2005, wet charts were dried using large fans that blew mold into the air (AR 1024, 1034, 1072). Thereafter, Plaintiff, a nurse, began

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B); 29 U.S.C. § 1132 (a)(1)(B).

to experience asthma-like symptoms with shortness of breath and upper respiratory symptoms (AR 1072). After Plaintiff had unrelated surgery in June 2005, her symptoms worsened and she experienced shortness of breath even at rest (AR 1072).

On July 22, 2005, Plaintiff was admitted to the hospital for exertional dyspnea (AR 1051-54). An echocardiogram showed no evidence of pulmonary hypertension, a CT scan ruled out pulmonary embolus, and chest x-rays were normal (AR 966-68, 1051-54). Plaintiff was discharged July 27, 2005 and saw Dr. Michael McCormack on July 29, 2005 (AR 1024-26). Dr. McCormack ordered that Plaintiff have a hypersensitivity pneumonitis panel done and noted that a bronchoscopy was unnecessary given Plaintiff's normal chest x-ray (AR 1026). An August 8, 2005 chest x-ray showed no pneumothorax and no acute findings (AR 944). Plaintiff was admitted to the hospital again on August 12, 2005, complaining of exertional dyspnea, etiology undetermined (AR 1033-35). Plaintiff's test results were all negative, and a CT of Plaintiff's thorax showed no evidence of pulmonary emboli or interstitial lung disease (AR 947, 1033-35).

On August 22, 2005, Plaintiff was seen by Dr. McCormack, who noted that Plaintiff's hypersensitivity pneumonitis panel was negative and that Plaintiff desired to follow up with Dr. Kevin Martinolich (AR 1015-16). An echocardiogram performed the same day was normal (AR 1007). Shortly thereafter, Plaintiff began treatment with Dr. Martinolich. Dr. Martinolich's notes from August 30, 2005 state that Plaintiff had a negative hypersensitivity pneumonitis panel and had unremarkable pulmonary function tests and biopsies, but he could not rule out hypersensitivity pneumonitis (AR 1029-30). In September and October 2005, Dr. Martinolich noted that "thus far no specific diagnosis has been made" and that "no definitive answer has been established yet" as to Plaintiff's diagnosis, and her dyspnea still had an unclear etiology (AR 974-76, 1012-13). Dr.

Martinolich referred Plaintiff to Dr. Jeffrey Schlactus for an evaluation of possible immunodeficiency in November 2005 (AR 852-53). A December 2005 CT scan of Plaintiff's neck was unremarkable (AR 881).

A February 22, 2006 CT of Plaintiff's thorax showed no airway disease, fibrosis or air trapping (AR 880). On March 8, 2006, an IV/PICC line was placed in Plaintiff (AR 840). After initially meeting with Plaintiff on January 11, 2007 and reviewing her extensive laboratory results, Dr. Joseph Wisniewski indicated on January 25, 2007 that Plaintiff had presumed hypersensitivity pneumonitis (AR 757-58). Dr. James Denneny began evaluating Plaintiff for tinnitus in 2007 and later became involved in her allergy problems (AR 1690-91, 1694).

Plaintiff visited Dr. Guy Smoak, her primary care physician, multiple times in 2007. On April 30, 2007, Dr. Smoak noted that Plaintiff would soon be tested for a mold allergy and that she continued to experience the same symptoms (AR 626). Dr. Smoak noted Plaintiff's diagnoses as dehydration, pulmonary embolus, hypersensitivity pneumonitis, and hypertension (AR 627). On May 30, 2007, Plaintiff reported to Dr. Smoak that she had seen a doctor in Ohio who thought she might have pulmonary fibrosis, and that her dehydration had been helped by medication (AR 633). On June 14, 2007, Plaintiff was having fewer problems with dehydration, still had some problems breathing, reported a severe mold allergy, and denied double vision (AR 637).

On June 28, 2007, Plaintiff presented with shortness of breath and was admitted to the hospital (AR 640). A chest x-ray performed that day was generally normal and showed no acute abnormalities (AR 641). On July 10, 2007, Plaintiff visited Dr. Smoak's office for a follow-up after her hospital visit, which had lasted until July 6, 2007 (AR 643). On July 16, 2007, Plaintiff saw Dr. Martinolich and was having ongoing problems with shortness of breath and dyspnea on exertion

(AR 710). Dr. Martinolich noted that there was a question of hypersensitivity pneumonitis and a question of atypical fungal process (AR 711). Plaintiff was doing better when she saw Dr. Smoak on July 26, 2007 and stated that her shortness of breath waxed and waned (AR 648). Plaintiff reported similarly sporadic symptoms on August 9, 2007 (AR 660). A CT scan of Plaintiff's chest on September 12, 2007 revealed no new pulmonary emboli and previously identified emboli were less conspicuous (AR 678). Plaintiff was admitted to the hospital on September 21, 2007 with chest pain and shortness of breath, and a chest x-ray showed no significant findings (AR 684-85). Plaintiff was having fewer problems with shortness of breath during a visit with Dr. Martinolich in September 2007 (AR 712).

Plaintiff saw Dr. John Adams on May 19, 2008 for treatment of her possible chlamydia pneumoniae endocarditis (AR 1707-08). Plaintiff was experiencing fewer symptoms and Dr. Adams did not expect a serologic change to signal improvement (AR 1707). Plaintiff also saw Dr. Gregory Brewer for her endocarditis treatment (AR 1640-50, 1669-77). Plaintiff saw Dr. Adams for a follow-up visit on August 22, 2008 and her symptoms and complaints had not changed (AR 1706). As part of an ongoing process to rule out a cardiac cause for her shortness of breath and exertional dyspnea and possibly to diagnose endocarditis, Plaintiff had echocardiograms on April 1, 2008; June 30, 2008; October 29, 2008; March 30, 2009; May 13, 2009; and June 19, 2009, with generally normal results (AR 1651-57, 1658-61). Plaintiff continued to see Dr. Smoak frequently throughout 2008 for follow-up appointments (AR 1513-15, 1520-21, 1530-50, 1554-55, 1563-64, 1571-77, 1597-99, 1603-04).

Plaintiff began to complain of pain in her right hip in September 2008, but x-rays showed only mild degenerative changes and an MRI showed a small right joint effusion and no evidence of

4

avascular necrosis (AR 1537, 1544, 1548-50). Plaintiff was diagnosed with chronic right trochanteric bursitis in late 2008 and received injections (AR 1617-22). Plaintiff was evaluated for physical therapy on October 16, 2008 and continued therapy until January 2009, when she was released due to improvement (AR 398, 1629-31).

A chest x-ray on October 6, 2008 showed no active heart or lung disease (AR 1536). Plaintiff saw Dr. Adams on November 7, 2008 to follow up on her chlamydia endocarditis and reported worsening symptoms, but Dr. Adams noted that there were "very little objective abnormalities demonstrable" to explain her multiple symptoms (AR 1704-05). Dr. Adams noted that Plaintiff's echocardiogram did not show any evidence of untreated endocarditis (AR 1704-05). Dr. Brewer's office notes from November 19, 2008 indicate that Plaintiff's endocarditis was questionable because it only showed up on one echocardiogram and had not been detected since (AR 1678-79). Plaintiff reported a recent severe episode of chest pain (AR 1678).

Plaintiff saw Dr. Martinolich for a follow-up visit on November 20, 2008 and reported doing well with no new complaints (AR 1316-17). Plaintiff was in the process of tapering off her steroid dosage (AR 1316-17). Dr. Denneny wrote a letter on December 1, 2008 explaining that Plaintiff was allergic to several molds and was receiving allergy shots, but single exposures still triggered significant reactions and she had not yet reached maximum medical recovery (AR 1690-91).

Plaintiff had surgery in January 2009 to take out cataracts in both eyes (AR 419). On January 22, 2009, Plaintiff had a follow-up appointment with Dr. Smoak and reported having chest pain at times, but oxygen helped (AR 1506-07). Plaintiff had several more follow up appointments with Dr. Smoak throughout 2009 and her symptoms increased and worsened sporadically, but had improved as of July and August 2009 (AR 1464-65, 1476-1500).

5

Plaintiff saw Dr. Denneny on February 4, 2009 and reported sensitivity to old library books that had recently caused her respiratory problems (AR 1689). Dr. Denneny told Plaintiff it looked like she was extremely sensitive to mold (AR 1689). Plaintiff saw Dr. Martinolich on February 20, 2009 and reported that she was doing well until she went to the library, took out a book, and was exposed to dust, which caused increased shortness of breath and dyspnea (AR 1314-15). Dr. Martinolich advised Plaintiff to stay away from old books (AR 1314-15). On March 2, 2009, Plaintiff saw Dr. Denneny, who noted that her allergies had not improved significantly (AR 1688). Plaintiff reported experiencing problems with mold exposure when going through old music at her house, and Dr. Denneny suggested the music and books be tested for molds (AR 1688).

Plaintiff had a thoracic surgery consultation on April 7, 2009 to discuss her pectus excavatum deformity (AR 1326-28). Dr. Joe Putnam suspected the deformity could be causing her pulmonary symptoms and recommended a series of tests to assess anatomy and cardiac function, but he would not perform surgery until Plaintiff had not taken steroids for three months (AR 399, 1328).

A chest x-ray of May 1, 2009 did not show any evidence of congestive heart failure (AR 1484). Also in May, Plaintiff was taken off the Doxycycline used to treat her endocarditis and began to experience her prior symptoms (AR 1644-45). Dr. Adams started Plaintiff on the Doxycycline again on May 12, 2009 (AR 1702-03).

A chest x-ray taken on June 9, 2009 showed no acute cardiopulmonary disease (AR 1479). Following her January 2009 cataract surgery, Plaintiff complained of double vision and halos in June 2009 (AR 419). Plaintiff saw Dr. Smoak on August 11, 2009 complaining of chest pain after a trip to Costa Rica with her husband, during which her symptoms worsened (AR 1470-71). Plaintiff was admitted to the hospital that day (AR 1470-71). A pulmonary consultation report on August 12,

2009 noted that the x-ray was unremarkable, that Plaintiff was not currently hypoxic but pulmonary embolus could not be ruled out, and that Plaintiff's other complaints were likely related (AR 1466-68).

Plaintiff saw Dr. Adams for a follow-up visit on August 21, 2009 and reported improved symptoms related to endocarditis after starting back on Doxycycline (AR 1462-63). Dr. Adams questioned why the first round of medication had not resolved the diagnosis, he noted the diagnosis was never definitively established, and he noted there could be a psychological overlay to Plaintiff's symptoms (AR 1462). Dr. Adams indicated that any return of symptoms after completion of a two year course of treatment could not be attributed to endocarditis (AR 1462).

Plaintiff saw Dr. Dorian Lain in August 2009 and again complained of double vision, although her vision was 20/30 without correction (AR 419). Dr. Lain believed the double vision was caused by the Restor implant and that no action was needed (AR 419). Plaintiff saw Dr. Denneny on August 25, 2009 to follow up on her allergy treatments (AR 1687). Dr. Denneny noted that Plaintiff had been doing well and then experienced problems with mold exposure in Costa Rica, so he would begin allergy shots again (AR 1687).

Plaintiff followed up with Dr. Martinolich on August 27, 2009 and reported a recent hospitalization for increased shortness of breath and exertional dyspnea following her trip to Costa Rica (AR 1312-13). Dr. Martinolich noted that the etiology of her shortness of breath was unclear and the reason for the acute flare-up was unclear (AR 1313). On September 15, 2009, Plaintiff visited Dr. Smoak and reported an improvement in her symptoms and Dr. Smoak noted that Plaintiff was doing fairly well (AR 1453-54).

### B.     Plaintiff's Claim for LTD Benefits

Plaintiff last worked on June 24, 2005 and initially applied for LTD benefits on August 27, 2005 (AR 1067). In support of her application, Dr. Smoak submitted a statement which indicated Plaintiff was suffering from pneumonitis and asthma and could not perform any exertional activity (AR 1069-70). Plaintiff's prognosis was fair and Dr. Smoak estimated her recovery would take several months (AR 1070).

Defendant approved Plaintiff's claim for benefits through January 31, 2006 by letter to Plaintiff dated November 8, 2005 (AR 372). The letter indicated that Plaintiff began receiving benefits on October 20, 2005 and explained that these benefits would be payable for 24 months if Plaintiff was totally disabled from her own occupation (AR 372). After 24 months, benefits would continue only if Plaintiff was totally disabled from any occupation (AR 372). Plaintiff applied for workers' compensation benefits on September 16, 2005 and began receiving benefits, which were later discontinued as of January 2006 (AR 260, 1071-72).

Defendant wrote to Plaintiff several times requesting more information about her disability, including an update about her application for Social Security disability benefits (AR 367, 363-65). Defendant also requested Claimant Questionnaires and Attending Physician's Statements of Continued Disability ("APS") several times throughout the course of evaluating Plaintiff's disability (AR 361-62).

Plaintiff filled out a Claimant Questionnaire on January 28, 2006 and noted that she suffered from "probable" hypersensitivity pneumonitis due to mold exposure (AR 911-14). Plaintiff stated that she was not allowed to work until she recovered and her immune system began to function again (AR 911). On January 30, 2006, Dr. Smoak filled out an APS and indicated that Plaintiff's primary

8

diagnosis was hypersensitivity pneumonitis (AR 909-10). Dr. Smoak wrote that Plaintiff would experience dizziness with excessive standing, would experience severe shortness of breath with exertion, including walking, lifting, carrying, pushing, or pulling, and would experience fatigue when sitting (AR 910). Dr. Smoak sent a letter to Defendant on May 8, 2006 and wrote that Plaintiff could not perform any work, including sedentary work (AR 819).

In an APS dated January 9, 2007, Dr. Smoak wrote that Plaintiff had hypersensitivity pneumonitis and asthma (AR 809). Dr. Smoak indicated that Plaintiff was impaired in standing because she was weak and dizzy after standing for five minutes, that she was impaired in walking because she experienced hypoxia and shortness of breath after walking on a level surface 10 to 20 feet, and that she was impaired in sitting because of fatigue and excessive daytime sleepiness (AR 810). As to lifting, carrying, pushing, pulling or driving, Dr. Smoak stated that Plaintiff could not perform any of these tasks and the expected duration of her limitations was unknown (AR 810).

On May 7, 2007, Defendant wrote to Plaintiff to advise her that the "any occupation" standard would be effective as of October 20, 2007 and that an investigation of whether Plaintiff's disability claim satisfied that standard was beginning (AR 358-60). Plaintiff filled out a Claimant Questionnaire on May 14, 2007 and wrote that some days she could only rest due to breathing problems and every day was different (AR 786-89). On some days, Plaintiff might be able to do a load or two of laundry with help from her family, go to the doctor, clean the kitchen, care for the dog, prepare meals with help, and might play the piano, do jigsaw puzzles, or sew by hand (AR 786).

On June 19, 2007, Dr. Smoak filled out a Physical Capabilities Evaluation Form and stated that Plaintiff could lift up to 20 pounds occasionally, could never drive, climb, stoop, kneel, or

crawl, could occasionally balance, crouch, reach, handle, and finger, and could frequently feel (i.e., sensing textures and temperatures) (AR 740-41). Dr. Smoak indicated that Plaintiff had several environmental limitations, including significant temperature fluctuations, high humidity, significant dust, and significant mold (AR 741).

Plaintiff filled out another Claim Questionnaire on September 29, 2007 and indicated that labored breathing was her most significant physical limitation, it became worse with exertion or talking, and she had little endurance (AR 692-94). Plaintiff wrote that she was physically unable to return to any kind of work (AR 693).

Dr. Smoak filled out an APS on October 4, 2007 and wrote that Plaintiff was experiencing chronic shortness of breath and chest pain (AR 705-06). Under the heading "Functional Capabilities," Dr. Smoak wrote that Plaintiff was "totally disabled" and was oxygen-dependent and short of breath even when resting (AR 706). Dr. Smoak also wrote that Plaintiff was "permanently, totally disabled" (AR 706).

On October 5, 2007, Defendant notified Plaintiff that she met the policy definition of total disability for any occupation and would continue to receive benefits past October 20, 2007 (AR 355). Plaintiff was awarded Social Security disability benefits by letter of March 11, 2008 (AR 612-14). Throughout 2008 and 2009, Defendant requested updated information from Plaintiff to support her disability claim, and Plaintiff and Dr. Smoak continued to submit Claimant Questionnaires and APS forms (AR 308-18, 321, 344-45, 350).

Dr. Smoak filled out an APS on May 21, 2008 and indicated that Plaintiff suffered primarily from allergic bronchopulmonary aspergillosis and secondarily from endocarditis (AR 542-43). Plaintiff also suffered from double vision (AR 543). Dr. Smoak opined that Plaintiff could sit for

three hours at a time, could stand for one hour at a time, but could not walk, could only occasionally lift or carry up to 10 pounds, could never kneel, crouch, or drive, could frequently finger and handle, but could only occasionally reach (AR 543).

Plaintiff filled out a Claimant Questionnaire on October 27, 2008 and indicated that she suffered from a recent lung infection, effusion, increased pain in her hip that limited walking, chlamydia pneumonia endocarditis for two years, chest pressure with exertion, hypertension, elevated temperature of unknown etiology, fatigue, lung disease, dehydration and cataracts (AR 534-37). Plaintiff wrote that she could only engage in minimal activity and could play the piano, sew by hand, write e-mails, go to the doctor and physical therapy, and go to the store (AR 534). Plaintiff needed assistance with grocery shopping most of the time and sometimes needed help with cooking but had been able to do laundry and wash dishes (AR 534). On June 5, 2009, Plaintiff filled out a Claimant Questionnaire and indicated that she could do laundry and light housekeeping with help, could play piano, read, and e-mail, although those activities were difficult with her vision problems, take care of a pet, go to doctors' appointments, and cook (AR 1816). Plaintiff included a typed outline of her disabling conditions (AR 1817).

An APS from Dr. Smoak dated August 24, 2009 (the last APS from Dr. Smoak in the record) indicated that Plaintiff could sit for four hours at a time for a total of six hours in a day, could stand for one hour for a total of three hours in a day, and could walk for half an hour for a total of two hours in a day (AR 1822-23). Dr. Smoak opined that Plaintiff could lift and/or carry up to 20 pounds occasionally but should never lift or carry anything above 20 pounds; could occasionally bend at the waist; could never kneel or crouch; could occasionally drive; and could occasionally reach, finger, and handle (AR 1823). Dr. Smoak noted that Plaintiff also had double vision in her

11

right eye and characterized these limitations as permanent (AR 1823).

On January 11, 2010, Defendant notified Plaintiff that she had been the subject of video surveillance in conjunction with the continuing evaluation of her disability claim (AR 307). By separate letters to Dr. Adams, Dr. Martinolich, and Dr. Smoak, and Dr. Lain dated January 12, 2010, Defendant requested information regarding Plaintiff's maximum level of function based partly on video surveillance of her activities on September 24-25, 2009 and an interview with Plaintiff on November 23, 2009 (AR 299-305, 1191-98, 1301-08, 1392-1401).

Defendant also requested file reviews of Plaintiff's claim from two doctors, ophthalmologist Dr. Joseph Goetz and internal medicine specialist Dr. Gary Nudell. Dr. Goetz and Dr. Nudell submitted their report on February 12, 2010 (AR 1268-75). Dr. Goetz spoke with Dr. Lain and reported that Dr. Lain stated that Plaintiff's ability to read an eye chart was not consistent with her subjective complaints (AR 1268). Dr. Goetz noted that Plaintiff appeared to be having a long-standing problem with double vision in her right eye and opined that from a visual standpoint, Plaintiff could work part-time for four hours a day but should avoid extensive visual tasks (AR 1271). Dr. Goetz further noted that Plaintiff's statement as of November 23, 2009 that the double vision started after her cataracts surgery contradicted the medical records, which indicated the double vision began in 2007 (AR 1272).

Dr. Nudell spoke with Dr. Smoak, who stated he had not seen Plaintiff recently, but she was convinced that she had environmental allergies, which could not be confirmed (AR 1272). Dr. Smoak declined to comment on Plaintiff's functional abilities, deferring to Plaintiff's treating specialists (AR 1272). Dr. Nudell opined that from an internal medicine perspective, the medical records did not support any functional limitations (AR 1273). Dr. Nudell noted that Plaintiff's

subjective complaints were not supported with clinical data and that all of her various diagnoses were somewhat speculative or presumptive because they were not supported by objective tests (AR 1274). Dr. Nudell noted the video surveillance of Plaintiff showed that she had the ability to ambulate without assistance, drive, shop and push a cart, and bend in and out of a car (AR 1274).

Finally, Defendant ordered an employability analysis report, which was completed on March 17, 2010 and listed six occupations Plaintiff retained the capacity to perform (AR 1159-90).

### C. Termination of Benefits and Plaintiff's Appeal

Defendant terminated Plaintiff's LTD benefits effective March 24, 2010 (AR 289). In the letter notifying Plaintiff of the termination, Defendant wrote that the investigation into Plaintiff's claim revealed that Plaintiff no longer satisfied the applicable disability standard (AR 289-95). Plaintiff appealed the denial of her LTD claim on August 16, 2010 (AR 1078-80). Plaintiff attached several exhibits to the appeal, including a vocational assessment and depositions from Dr. James Denneny and Dr. Kevin Martinolich[2] (AR 1081-1155). Vocational consultant Michael Galloway opined in his report of August 12, 2010 that Plaintiff could not perform any occupation in the labor market due to the permanent restrictions indicated by Plaintiff's treating physicians (AR 1089). Mr. Galloway opined that the video surveillance of Plaintiff was similar to Plaintiff's own statements about her capabilities (i.e., that she could shop for 30-40 minutes at a time) and that one hour of driving and shopping did not necessarily translate into an ability to work on a daily basis (AR 1090).

Dr. Denneny testified that every time he saw Plaintiff, she was short of breath and looked like a respiratory patient (AR 1105). Dr. Denneny stated that Plaintiff was sensitive to all of the 10

---

[2] These depositions were taken in Plaintiff's workers' compensation lawsuit against her employer, *Jenny Kelley v. Blount Memorial Hospital*, No. 166874-1, filed in the Chancery Court of Knox County, Tennessee.

molds tested for allergic reaction and she was in the top 10-20% of those tested for allergies due to this sensitivity (AR 1106). Dr. Denneny characterized Plaintiff's symptoms as waxing and waning and noted the symptoms reappear after Plaintiff is exposed to mold and other substances that cause a reaction (AR 1109). Dr. Denneny testified that Plaintiff's situation was discouraging to him as a physician because Plaintiff was trying everything her doctors gave her to get better and it did not seem to be working (AR 1109). Dr. Denneny opined that Plaintiff was not employable due to her respiratory status because an employer would not be able to count on her for three hours at a time and it would be difficult to have an office environment without triggers (AR 1113). Dr. Denneny believed that Plaintiff was being honest with him about her impairments and that he did not think she was exaggerating her complaints (AR 1114-15). At the time of the deposition in March 2010, Dr. Denneny had not seen Plaintiff since December 7, 2009 (AR 1121).

Dr. Martinolich testified that although Plaintiff had a negative hypersensitivity pneumonitis panel, that was not conclusive because she could still have the condition with a normal test and normal x-rays (AR 1138). Dr. Martinolich indicated that Plaintiff's lung biopsy was also nondiagnostic, but based on her symptoms and the work incident, he believed that she was experiencing an acute hypersensitivity response (AR 1138). The biopsy showed some changes that could be associated with hypersensitivity pneumonitis and after consulting with other physicians, he still believed it was the ultimate diagnosis (AR 1146). Dr. Martinolich testified that he settled on the diagnosis after some time because he could not discern another diagnosis that would fit Plaintiff's condition (AR 1149). Dr. Martinolich thought Plaintiff was a reliable historian and referred her to a psychologist to verify that there were no psychological issues with the veracity of Plaintiff's complaints, and the psychologist reported that there were not (AR 1142-43).

Plaintiff also submitted additional medical records as follows. Plaintiff was admitted to the hospital on March 14, 2010 and saw Dr. Paul Branca for a pulmonary consultation (AR 2043-45, 2077-79). Dr. Branca noted that Plaintiff's CT scans showed no pulmonary embolism, her labs were unremarkable, and he opined that her hypersensitivity pneumonitis diagnosis was questionable because there was no histological evidence to support it (AR 2043-45, AR 2077-79).

Plaintiff's records from Dr. Lain in May 2010 reflect that the Restor lens was in good position, her cornea was clear and Plaintiff was doing well with no significant abnormalities in her eyes (AR 419).

On July 6, 2010, Plaintiff was admitted to the hospital with extreme shortness of breath which she thought occurred after she was exposed to mold spores while reading the paper or looking at old photographs (AR 1936-38). Plaintiff was discharged on July 9, 2010 (AR 1933-35). Plaintiff's chest x-rays during the hospital stay were normal, and her pulmonary function tests showed no obstruction (AR 1978-80, 1981-85).

Plaintiff was admitted to the hospital again on July 19, 2010 for hypertensive urgency and chest pain (AR 2584-86). Although Plaintiff said she felt like she could not breathe, it was noted that she could carry on a long conversation without accessory muscle use or stops in conversation (AR 2587-90). Plaintiff's full workup during this stay was unremarkable; multiple chest x-rays showed no acute pulmonary findings, borderline cardiomegaly and prominent pectus excavatum deformity, her angiography was unremarkable, and a lung scan showed a low probability for pulmonary embolism (AR 1845, 1850-53, 2584-86). During the hospital stay, Plaintiff was also evaluated for general anxiety disorder and hyperchondrism (AR 2596). The impression was adjustment disorder with mixed anxiety and depressed mood, mild, due to health issues, and Plaintiff

15

was assigned a GAF of 60 (AR 2596).

As part of the appeal, Defendant contacted Plaintiff's physicians for more information (AR 280-85). Defendant also had two additional physicians review Plaintiff's claim: Dr. Raymond Chagnon, a specialist in internal medicine, and Dr. Robert Josephberg, an ophthalmologist, who submitted their reports on December 15, 2010 (AR 386-423). Dr. Chagnon and Dr. Josephberg reviewed the entirety of Plaintiff's file, including her extensive medical records and the video surveillance, and Dr. Chagnon attempted to consult with Dr. Smoak, Dr. Denneny and Dr. Martinolich without success (AR 400-01). Dr. Chagnon concluded Plaintiff was functional as of March 24, 2010 and would be able to do light work, with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently (AR 404). Dr. Chagnon opined that Plaintiff could sit for two hours at a time before she needed to change position, could stand for two hours at a time for a total of four hours in an eight hour day with rest periods of three to five minutes in between, and would be able to walk for one hour at a time for up to three hours in an eight hour day, with rest periods of three to five minutes in between (AR 404). Dr. Chagnon further opined that Plaintiff would have no restrictions as to bending, kneeling, crawling, stooping, or squatting; could push and pull 30 pounds occasionally, 20 pounds frequently, and 10 pounds constantly; had no restrictions in reaching, fine motor activity, or typing; but should not be on ladders or on unprotected heights (AR 404). Dr. Chagnon opined Plaintiff's major restriction was to be in an environment where she would have minimal exposure to molds since molds exacerbated her symptoms of hypersensitivity pneumonitis (AR 404). Dr. Chagnon imposed the above restrictions for one year and indicated that reevaluation in one year would be appropriate (AR 404).

Dr. Josephberg noted in his report that Plaintiff's diagnosis of hypersensitivity pneumonitis

was "idiopathic" because multiple lung and serum antibody and antigen studies had been performed, but lung biopsies remained inconclusive and showed minimal lung involvement (AR 418). Dr. Josephberg further observed that objective testing of Plaintiff was generally normal (AR 418). As to Plaintiff's vision, Dr. Josephberg noted that neither of Plaintiff's doctors had ever addressed the etiology of her vision impairments and Dr. Bodenheimer stated that he could give no reason for her symptomatology (AR 419). Dr. Josephberg observed that Plaintiff complained of double vision, halos, and floaters after cataract surgery and after attempts at correction (AR 419-20). Dr. Josephberg consulted with Dr. Lain and noted that Dr. Lain believed Plaintiff to be honest and he was perplexed by, and could not explain, Plaintiff's complaints of double vision in one eye (AR 420). Dr. Lain reported that Plaintiff was always disheveled and short of breath during office visits and he opined that Plaintiff could work 20 hours a week based on her visual and physical problems (AR 420).

Dr. Josephberg described the video surveillance of Plaintiff's activities to be "way out of proportion to the medical records" because Plaintiff did not appear to have any shortness of breath, appeared to be quite fit, and was fully functional without any difficulties (AR 421). Dr. Josephberg felt that Plaintiff was exaggerating her physical complaints and that Plaintiff was capable of working 40 hours a week even with her visual complaints (AR 421). Dr. Josephberg noted that it was very unusual to have double vision in only one eye and that it could be corrected if the cause was the Restor lens, although there was no documented evidence that the lens was causing double vision (AR 421-22). Dr. Josephberg opined that there was a major malingering element to Plaintiff's complaints and some were objective, but only secondary to her use of various medications (AR 422). Dr. Josephberg concluded that Plaintiff could work up to 40 hours a week, that her only visual

limitation would be no night driving, and that she should work in an environment that limited her exposure to mold (AR 422).

By letter of December 23, 2010, Defendant notified Plaintiff that her appeal was denied and the determination that Plaintiff was not disabled under the Plan would stand (AR 276-79).

## II.     ANALYSIS

Plaintiff does not argue that Defendant's review of her claim is procedurally defective; she challenges instead the substantive decision that she is no longer disabled under the Plan provisions. The Court must therefore determine whether, in light of the entire record, Defendant's conclusion that Plaintiff is no longer disabled under the Plan is the result of a deliberate, principled reasoning process supported by substantial evidence and, thus, not arbitrary and capricious.

### A.     Standard of Review

It is undisputed that this case is subject to the arbitrary-and-capricious standard of review [Doc. 19-1 at PageID#: 2790; Doc. 23 at PageID#: 2806-07]. The Plan gives Defendant discretion to determine eligibility for LTD benefits (AR 26)[3] and, therefore, its decisions must be affirmed unless they are "arbitrary and capricious." *Calvert v. Firstar Finance Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005). If it is possible to offer a "reasoned explanation" for the decision, based on all the evidence known to the administrator, then the decision is not arbitrary and capricious. *Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir. 2000); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169, 172 (6th Cir. 2003). Courts must scrutinize

---

[3] The provision reads: "The plan administrator has delegated sole discretionary authority to [Defendant] to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in conjunction with it." (AR 26-27).

18

the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006) (*aff'd* 128 S. Ct. 2343).

## B. Defendant's Termination of LTD benefits

Plaintiff makes two main arguments that the termination of her LTD benefits is arbitrary and capricious. First, Plaintiff argues generally that she is "disabled" under the Plan because she is not gainfully employed and has an injury or sickness that makes her "continuously unable to engage in any occupation" for which she is qualified [Doc. 19-1 at PageID#: 2791, AR 11]. Plaintiff points out that after March 24, 2010, the date her benefits ceased, she had two lengthy hospitalizations and she argues that she has been continuously disabled since she began to receive her "any occupation" benefits in October 2007 [Doc. 19-1 at PageID#: 2791]. Second, Plaintiff argues that Defendant failed to provide a full and fair review and improperly denied her claim because it relied on file reviews that were at odds with the medical records of Plaintiff's treating physicians [Doc. 19-1 at PageID#: 2792-93]. Plaintiff also argues that her inability to perform daily household tasks should have been considered [*id.* at PageID#: 2793].

Defendant argues the decision to terminate benefits was not arbitrary and capricious and that Plaintiff failed to provide, as proof of continuing disability, "[o]bjective medical findings which support *Your Disability*" as required by the Plan (AR 20). Defendant asserts Plaintiff's treating physicians have been unable to square her subjective symptoms and complaints with her consistently normal test results, arguing that Plaintiff's diagnoses have been largely presumptive, speculative,

19

or diagnoses of exclusion and that there is little medical evidence supporting functional limitations that render Plaintiff disabled from performing any occupation [Doc. 23 at PageID#: 2810]. Defendant further notes that many of Plaintiff's symptomatic episodes have occurred after she exposed herself to old books, newspapers, and photographs [*id.* at PageID#: 2813]. Defendant contends it was proper to rely on the reports of the physicians who reviewed Plaintiff's file because the reports reconciled with the medical evidence in the record, which the physicians reviewed extensively, and the video surveillance reviewed by the physicians showed that Plaintiff was functional [*id.* at PageID#: 2814-17]. Defendant finally argues that it relied upon multiple pieces of evidence–an employability analysis, in-person interview, surveillance, medical records, and four file reviews by physicians– in reaching its decision on Plaintiff's claim, such that its review was well-reasoned and not arbitrary and capricious [*id.* at PageID#: 2820].

In the letter notifying Plaintiff that her benefits would be terminated, Defendant stated that it had determined Plaintiff had the ability to work up to 40 hours a week, with capabilities including sitting with intermittent periods of standing or walking, lifting and/or carrying up to 10 pounds occasionally, and using her upper extremities (AR 292). Defendant noted that it sought functional assessments from Dr. Martinolich, Dr. Adams, and Dr. Smoak based on this determination and did not receive a response indicating that Plaintiff had more severe functional limitations as to her physical capabilities; in fact, Dr. Martinolich declined to make a functional assessment, Dr. Adams deferred to Dr. Smoak, and Dr. Smoak did not respond (AR 292). With respect to Plaintiff's visual impairments, Defendant noted that Dr. Lain responded that Plaintiff would not be able to work up to 40 hours a week (AR 292). Defendant summarized the reports of Dr. Nudell and Dr. Goetz and the employability analysis report, concluding that Plaintiff's file did not support severe impairments

that would prevent Plaintiff from returning to work (AR 293-94). Defendant also stated in the letter that the etiology of Plaintiff's conditions was inconclusive and the diagnoses appeared to be based mainly on self-reported symptoms (AR 294).

After reviewing the entire record, I **FIND** that Defendant considered a great deal of information before making its decision to terminate Plaintiff's LTD benefits and in upholding that decision on appeal. I **CONCLUDE** that Defendant's decision was the result of a deliberate reasoning process supported by substantial evidence. Thus, the decision to terminate Plaintiff's LTD benefits under the Plan was not arbitrary and capricious.

Evaluation of a plan administrator's decision under the arbitrary-and-capricious standard of review, the Court must consider several factors, "including the existence of a conflict of interest, the plan administrator's consideration of the Social Security Administration's determination, and the quality and quantity of medical evidence and opinions." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009). Plaintiff did not allege that Defendant was acting under a conflict of interest in this case, but Defendant acknowledged that an inherent conflict of interest exists in this case [Doc. 23 at PageID#: 2807]. Plaintiff has not argued that the conflict of interest colored Defendant's decision to terminate her LTD benefits, and I **CONCLUDE** little to no weight should be afforded to this factor under the circumstances at issue. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 58 (6th Cir. 2010) ("A lack of evidence that a purported conflict of interest motivated a particular benefits decision at issue has, in the past, been sufficient in our circuit to avoid consideration of that conflict in conducting arbitrary-and-capricious review.").

As noted, another factor the Court may consider is the weight afforded by the plan administrator to an award of Social Security disability benefits. *Id.*; *Cox v. Standard Ins. Co.*, 585

21

F.3d 295, 302-03 (6th Cir. 2009). Plaintiff did not specifically address this factor and, while it appears Plaintiff was still receiving Social Security disability benefits when Defendant rendered its decision to terminate her LTD benefits, the mere existence of a favorable Social Security determination, particularly one made years before the plan administrator's decision terminating LTD benefits, does not render the decision arbitrary and capricious. *Cox*, 585 F.3d at 303. In the absence of argument or evidence concerning this factor, I **CONCLUDE** it, too, should be afforded little weight under the circumstances.

Yet another factor the Court may consider in its analysis is an administrator's change of course from its initial benefits decision. Defendant approved and paid Plaintiff's LTD benefits for approximately three years under first the "own occupation" and then the "any occupation" standard, before Defendant terminated her benefits effective March 2010. Plaintiff did not make any meaningful argument with respect to Defendant's change of course, but such a change, without any precipitating alteration in evidence, may tend to show an administrator has acted capriciously. *See*, *e.g.*, *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009); *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009). As explained above, an administrator must show that its decision was procedurally sound and supported by substantial evidence, and what evidence is "substantial" will necessarily vary with the facts of each case. There is no explicit requirement that medical improvement be shown before reversal of an administrator's previous decision can be supported by substantial evidence. *See Nicolai v. Aetna Life Ins. Co.*, No. 08-CV-14626, 2010 WL 2231892, at *6 (E.D. Mich. June 3, 2010); *Carswell v. Raytheon Emps. Disability Trust*, 142 F. Supp. 2d 939, 942-43 (E.D. Tenn. 2001). Accordingly, the standard of review remains the same and the Court must consider Plaintiff's claim in light of all evidence in the

administrative record, including Defendant's prior decision to approve LTD benefits.

During its decisionmaking process, Defendant reviewed the extensive medical records in Plaintiff's file, contacted Plaintiff's treating physicians for their opinions as to Plaintiff's functional abilities, had two physicians review the file, conducted video surveillance, conducted an in-person interview, and conducted an employability analysis report. After Plaintiff appealed the initial termination decision, Defendant submitted Plaintiff's file for additional reviews by another ophthalmologist and another internal medicine specialist.[4]

The medical records are replete with dozens of tests, including chest x-rays, CT scans, pulmonary function tests, echocardiograms, and a lung biopsy that are generally normal, with little to no evidence to support Plaintiff's diagnoses other than her allergies to mold (AR 678, 685, 880-81, 944-47, 966-68, 1033-35, 1051-54, 1466-68, 1479, 1484, 1536, 1651-61, 1845, 1850-53, 1978-80, 1981-85, 2077-79, 2584-86). Many of the tests were performed to substantiate Plaintiff's diagnosis of hypersensitivity pneumonitis, without success, and Plaintiff has submitted to extensive additional testing to rule out a cardiac cause for her shortness of breath and dyspnea. Plaintiff's diagnosis of endocarditis showed up on one echocardiogram and no others, but she remained on treatment for this possible condition for at least 18 months (AR 1678-79). As Defendant argued, there are many references in the medical records where Plaintiff's physicians indicated that Plaintiff's diagnoses were presumed, speculative, or merely possible and that the diagnoses were not definitively established by objective medical testing (AR 710-11, 757-58, 974-76, 1012-13, 1312-13, 1462-63, 1678-79, 1704-08, 2043-45, 2587-90). At least two doctors had Plaintiff

---

[4] For the most part, the physician reviews at Defendant's appeals level echoed the reviews completed by Dr. Nudell and Dr. Goetz, although Dr. Josephberg was more skeptical regarding any limitations caused by Plaintiff's visual impairments.

evaluated to determine if there was a psychological component to her symptoms because of her consistently normal test results, and Dr. Adams suspected a psychological overlay to Plaintiff's symptoms after the cessation of Doxycycline for her suspected endocarditis caused an inexplicable return of symptoms (AR 1143-43, 1462-63, 2596).

Moreover, and considering Plaintiff's claim in the context of an absence of objective tests to establish Plaintiff's disabling conditions, the record is also deficient in recent opinions from treating physicians to support the conclusion that Plaintiff suffers from a permanent disability with resulting limitations that prevent her from engaging in any occupation under the Plan. Although Dr. Smoak filled out many forms indicating varying degrees of functional limitations throughout Plaintiff's treatment, when Dr. Nudell asked Dr. Smoak about Plaintiff's limitations as part of his review of Plaintiff's file prior to the termination of LTD benefits, Dr. Smoak commented that he had not recently seen Plaintiff, that Plaintiff believed she had environmental allergies, which could not be confirmed, and he deferred to Plaintiff's treating physicians for an assessment of her limitations (AR 1272). Dr. Smoak's last APS of August 24, 2009 indicated, in part, that Plaintiff was able to sit, stand and walk for various amounts of time and could lift or carry up to 20 pounds occasionally (AR 1822-23).[5] Dr. Martinolich, who treated Plaintiff's pulmonary complaints for a significant amount of time, declined to assess Plaintiff's functional abilities throughout his treatment and testified that the hypersensitivity pneumonitis diagnosis was essentially one of exclusion because he could not settle on another diagnosis that would fit Plaintiff's symptoms (AR 1149). Dr. Denneny, however, testified that Plaintiff could not work due to her respiratory status because she

---

[5] These restrictions are similar to the restrictions Defendant reached in March 2010 after reviewing Plaintiff's medical records, activity information, and self-reported capabilities (AR 292).

would be an unreliable employee and it would be difficult to find a work environment that would not trigger Plaintiff's symptoms, although he had not seen or evaluated Plaintiff for some time (AR 1113, 1121).

To further assist in its review, Defendant conducted video surveillance of Plaintiff on September 24-25, 2009, and the resulting video was reviewed by Drs. Nudell, Goetz, Josephberg, and Chagnon. Although the video itself does not appear to be included in the administrative record, a report of the video surveillance is included, and neither party has objected to the report's accuracy (AR 1392-1401). The report indicates that, at least on one day of the surveillance, Plaintiff was observed driving a car, shopping at two stores, bending and stooping to obtain items from shelves, and carrying several bags. At least some doctors reviewing this video concluded Plaintiff performed all of these tasks without any apparent physical problems (AR 420-21). The reviewing physicians relied on the video surveillance, along with the documented contrast between Plaintiff's subjective symptoms and the absence of objective test results to support her conditions, to reach the conclusion that Plaintiff was functional and capable of working, subject to a few limitations, such as avoiding exposure to molds and night driving.

Although Plaintiff argues that Defendant failed to consider her inability to perform household tasks, any such inability is self-reported by Plaintiff and does not appear to be substantiated by the video surveillance or any recent treating physician opinion. As noted above, Dr. Smoak's last APS indicated that Plaintiff was able to sit, stand and walk for various amounts of time and could lift or carry up to 20 pounds occasionally (AR 1822-23). Moreover, Plaintiff's last Claimant Questionnaire of June 5, 2009 stated that on at least some days she could do laundry and light housekeeping with help, could cook, take care of a pet, and go to doctor's appointments (AR

1816).

As noted above, the Plan further requires "[o]bjective medical findings which support *Your Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s)" (AR 20). Essentially, this case involves a claimant who has had extensive objective testing with little evidence to support diagnoses that resulted from her subjective symptoms and, within that context, her record lacks any recent, significant opinions from treating physicians to support Plaintiff's diagnoses or establish functional limitations to support a permanent disability that would restrict Plaintiff from working in any occupation.

In short, in its consideration and treatment of Plaintiff's evidence, including the opinions of treating physicians, Defendant conducted an extensive file review that contained all of the appropriate information about Plaintiff's condition, and Defendant did not reject any objectively-verifiable evidence of disability. Under these circumstances and considering the arguments presented by Plaintiff, I **CONCLUDE** that Defendant's decision to terminate her LTD benefits because she no longer satisfied the "any occupation" standard under the Plan was not arbitrary and capricious.

## III. CONCLUSION

Having carefully reviewed the administrative record and the pleadings, I **RECOMMEND** that:[6]

    (1)    Plaintiff's motion for judgment on the pleadings [Doc. 19] be **DENIED**;

    (2)    Defendant's motion for judgment on the pleadings [Doc. 22] be **GRANTED**; and

    (3)    This action be **DISMISSED WITH PREJUDICE**.


s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).